(No. 21470.—

WALTER BACHRACH *et al.* Appellees, *vs.* OSCAR NELSON, Auditor of Public Accounts, *et al.* Appellants.

*Opinion filed October 22, 1932.*

Oscar E. Carlstrom, Attorney General, Montgomery S. Winning, and David J. Kadyk, for appellants.

Moses, Kennedy, Stein & Bachrach, Wilson & Mc-Ilvaine, Graham & Graham, Foreman, Bluford, Krinsley & Schultz, Fyffe & Clarke, and Hugh J. Dobbs, (Walter Bachrach, William B. McIlvaine, J. F. Dammann, Albert Langeluttig, Raymond Schultz, Victor J. Voorheis, Raymond Harkrider, David R. Clarke, and John Harrington, of counsel,) for appellees.

Winston, Strawn & Shaw, for the Chicago Association of Commerce, *amicus curiæ;* Donald Kirkpatrick, *amicus curiæ.*

Mr. Justice Orr delivered the opinion of the court:

The constitutionality of "An act in relation to a tax upon persons and fiduciaries based upon income," commonly known as the Income Tax law, is the sole question presented by this appeal. This law was enacted at the first special session of the Fifty-seventh General Assembly and approved by the Governor on February 22, 1932. At the same time "An act making an appropriation [of $5000] to the Department of Finance for carrying into effect and administering" its provisions was also passed and approved. Thereafter suit was filed in the circuit court of Sangamon county by Walter Bachrach, as a resident, citizen and tax-payer of Illinois, for himself and all other tax-payers similarly situated, for the purpose of testing the constitutionality of the Income Tax law and to enjoin the appellants from incurring any expenses or making any disbursements from the State treasury under the second act above mentioned. Subsequently, for the same purpose and by leave of court, Michael Cullinan, as a resident, citizen and tax-payer of this State, filed an intervening bill of complaint, and David H. McMaster, of like qualifications and as an

owner of real estate and personal property subject to taxation, filed an independent suit, which by order of court was consolidated with the Bachrach suit. The appellants filed a general demurrer to the several bills of complaint, and thereafter McMaster by leave of court filed an amended bill and the demurrer was re-filed to the amended bill. Following a hearing on the bills and demurrer the circuit court determined that the Income Tax law was unconstitutional and that any expenditure made under the appropriation act to carry it into effect would be an illegal diversion of public funds, and the decree appealed from was then entered in accordance with the prayer of the bill.

By its terms the Income Tax law, although not effective until July 1, 1932, subjects incomes received subsequent to January 1, 1932, to taxation. It imposes a graduated tax upon every resident of the State with respect to his entire net income at the following rates: One per cent on the first $1000, two per cent on the next $3000, three per cent on the next $5000, four per cent on the next $7000, five per cent on the next $9000, and six per cent on all net income over $25,000. A like tax is imposed upon every non-resident with respect to his net income from all property owned and from every business, trade, profession and occupation carried on in this State by such non-resident, and upon either the fiduciaries or beneficiaries of estates and trusts respecting such estate or trust incomes. The following exemptions are allowed tax-payers: (1) In the case of a single person, or a married person not living with or supporting a husband or wife or family, an exemption of $1000; (2) in the case of the head of a family or a married person living with husband or wife, an exemption of $2500; (3) $300 for each person (other than husband or wife) dependent upon and receiving his chief support from the tax-payer, if such dependent is under eighteen years of age or is incapable of self-support because mentally or physically defective.

Under this act capital gains are not taxable, capital losses are not deductible, and provision is made for a large number of non-taxable items and deductions from incomes and credits against the tax. No tax is imposed upon corporations unless acting in a fiduciary capacity, and then not upon the income of the corporation but upon the income of the trust estate which it administers.

Paragraph 2 of section 9a of the act provides that property taxes paid on residence property to an amount not exceeding $100 per annum may be allowed as a credit against the income tax of the residence owner but does not provide that a reasonable rental value of residence property shall be considered in determining the net income. Section 11 of the act provides that a non-resident who pays an income tax in another State from sources in Illinois may be allowed such payment as a credit on his tax, provided the other State allows a similar reciprocal right to non-residents of that State upon which the foreign State levies an income tax. Non-residents, however, who pay a tax upon income derived from sources in Illinois are allowed the same deductions as are residents of Illinois and are subject to like penalties for failure to file returns and pay taxes. By section 15 of the act a non-resident of Illinois is subject to an additional penalty to which a resident of Illinois is not subjected, namely, that the failure of a non-resident to file a complete return of his gross income, both within and without the State of Illinois, subjects him to the penalty of disallowance of all deductions for interest, taxes and losses, etc., allowed under section 8 of the act, and there is no requirement that this failure should be deliberate or willful.

It is admitted by the Attorney General, in behalf of appellants, that if any one of three fundamental objections raised by appellees against the constitutionality of the present law is sound, then no satisfactory income tax legislation can be passed under our present constitution.

The objection first raised and argued at greatest length by appellees is that the Income Tax law of 1932 is invalid because it is contrary to sections 1 and 2 of article 9 of the constitution of Illinois. These sections provide as follows:

"Sec. 1. The General Assembly shall provide such revenue as may be needful, by levying a tax, by valuation, so that every person and corporation shall pay a tax in proportion to the value of his, her or its property—such value to be ascertained by some person or persons, to be elected or appointed in such manner as the General Assembly shall direct, and not otherwise; but the General Assembly shall have power to tax peddlers, auctioneers, brokers, hawkers, merchants, commission merchants, showmen, jugglers, innkeepers, grocery keepers, liquor dealers, toll bridges, ferries, insurance, telegraph and express interests or business, venders of patents, and persons or corporations owning or using franchises and privileges, in such manner as it shall from time to time direct by general law, uniform as to the class upon which it operates.

"Sec. 2. The specification of the objects and subjects of taxation shall not deprive the General Assembly of the power to require other subjects or objects to be taxed in such manner as may be consistent with the principles of taxation fixed in this constitution."

Appellees contend that both of the foregoing sections of the constitution confine the power of the General Assembly in the imposition of taxes to (1) property by valuation, and (2) occupations, franchises and privileges. On the other hand, the appellants contend that whatever may be the limitations of section 1 they are sufficiently removed by section 2 to permit the legislature to tax, as "subjects or objects" mentioned in section 2, the right to produce, create, receive and enjoy an income. The power of the legislature to levy the proposed income tax is therefore dependent upon the true meaning of the above quoted revenue provisions of the constitution.

Considered first from an historical standpoint, it appears that for over a century Illinois has been definitely committed to the policy of raising its needed revenue by a general property tax, with the burden apportioned according to valuation. Such a provision appears in article 8 of our constitution of 1818, declaring, in section 20, "that the mode of levying a tax shall be by valuation, so that every person shall pay a tax in proportion to the value of the property he or she has in his or her possession." Following the adoption of our first constitution the general property tax was gradually extended to include intangibles. Bank stock was added to the taxable list in 1819, and taxes for county purposes were authorized on carriages, distilleries, stock in trade, and such other personal property as was thought proper. (Laws of 1819, p. 313.) In 1827 the law specifically named horses, mares, mules, asses, neat cattle above three years of age, and watches and their appendages. (Laws of 1827, p. 325.) Ferries were added in 1829. (Laws of 1828-29, p. 123.) In 1839 an act was passed which abolished former arbitrary land classifications and substituted a provision that both land and personal property should "be valued according to the true value thereof." (Laws of 1838-39, p. 3.) This law broadened the definition of taxable property to include "money actually loaned" and "all other description of personal property" and restricted the exemptions. The law of 1845 imposed taxes on "all property, real and personal, within the State." (Laws of 1844-45, p. 3.) Real property was then defined to include not only lands but also improvements, and personal property was enlarged by definition to include every species of property not included in the description of real estate. Up to 1848 it appears that no suggestion of an income tax is to be found in our legislative history, the purpose evidently remaining to apportion the tax burden on all real and personal property according to its valuation.

Prior to the adoption of our second constitution, in 1848, economic disturbances had occurred in Illinois and the country at large, particularly during the years 1843 and 1844. Illinois had increased its State debt to between fifteen and twenty million dollars (Haig's History of Taxation in Illinois, p. 77,) as a result of reckless spending of borrowed money for internal improvements. Many bank failures occurred and taxable property rapidly decreased in value. The magnitude of the State debt caused the northern counties to petition Congress to change the boundaries of Illinois so as to include them within the limits of Wisconsin. A minority advocated repudiation of the State debt. To meet this emergency a poll tax was proposed in 1847 to provide additional revenue, but the legislature decided to put the issue up to the constitutional convention (1847-48) whose delegates were about to be chosen. (Laws of 1846-47, p. 33.) Similar conditions existed in other States, and many were compelled to resort to unusual forms of taxation to raise needed revenue. In 1840 Pennsylvania imposed a tax of one per cent on all salaries and of one mill on each dollar received from every trade, occupation and profession not already taxed, and in 1841 raised these rates to two per cent and one per cent, respectively. In 1842 Maryland imposed a tax of two and one-half per cent on salaries and all incomes from professions, faculties and employments. Virginia and Alabama in 1843, Florida, Texas and Louisiana in 1845, and North Carolina in 1849, all imposed taxes on incomes in one form or another.

Notwithstanding these years of adversity, with other States adopting legislation by which much needed revenue was provided through the agency of income taxes, it is significant that Illinois failed in 1848 to change its policy of raising revenue by a tax on property according to valuation. Aside from authority to impose a capitation tax, the newly adopted constitution of that year adhered to the

policy formerly enunciated, in the following language in article 9:

"Sec. 2. The General Assembly shall provide for levying a tax by valuation, so that every person and corporation shall pay a tax in proportion to the value of his or her property; such value to be ascertained by some person or persons to be elected or appointed in such manner, as the General Assembly shall direct, and not otherwise; but the General Assembly shall have power to tax peddlers, auctioneers, brokers, hawkers, merchants, commission merchants, showmen, jugglers, inn keepers, grocery keepers, toll bridges and ferries, and persons using and exercising franchises and privileges, in such manner as they shall, from time to time, direct."

"Sec. 6. The specification of the objects and subjects of taxation shall not deprive the General Assembly of the power to require other objects or subjects to be taxed, in such manner as may be consistent with the principles of taxation fixed in this constitution."

By section 2 of the constitution of 1848 it is apparent that the general property tax was made mandatory and that general property taxation by valuation was made the exclusive method of apportioning the tax burden "so that every person and corporation shall pay a tax in proportion to the value of his or her property." Classification by the legislature of property for tax purposes, such as had been permitted prior to 1848, was no longer possible. On the other hand, specific power and discretion were given to the legislature by the latter part of section 2 to tax certain businesses and occupations, as well as "persons using and exercising franchises and privileges, in such manner as they shall, from time to time, direct." Under this section similar taxes and license fees which had been imposed by the legislature from time to time under the constitution of 1818 (*People* v. *Thurber,* 13 Ill. 554,) were distinctly specified and others added. (Fairlie on Taxation and Revenue Sys-

tem of Illinois, 1910, p. 106.) Property of every kind and description, whether then or thereafter in existence, was to be subject to the *ad valorem* tax, and occupations, franchises and privileges, other than those specified in the latter half of section 2, were also to be taxed if the legislature should see fit. *Price* v. *People*, 193 Ill. 114.

Section 6 of article 9 of the constitution of 1848 is identical with section 2 of article 9 of the constitution of 1870. The obvious purpose of this section was to permit the General Assembly to add new occupations, franchises and privileges to the list specifically designated for taxation by the preceding section 2 in the constitution of 1848 and by section 1 in the constitution of 1870. This conclusion was reached in a former decision of this court, (*People* v. *Worthington*, 21 Ill. 170,) where in 1859 these same provisions of the constitution of 1848 were considered. This court then said: "But, as if to silence all cavil or dispute about the power of the legislature to impose a tax upon everything of value, whether tangible or intangible, the last section of the same article of the constitution provides as follows: 'The specifications of the objects and subjects of taxation, shall not deprive the General Assembly of the power to require other objects and subjects of taxation to be taxed in such manner as may be consistent with the principles of taxation, fixed by this constitution.' The principle of taxation here referred to is, undoubtedly, the *ad valorem* principle, except in the cases specified in the last part of section 2 of the ninth article, where the legislature is authorized to depart from the *ad valorem* principle." In the interim between 1848 and 1870 we find no use made of the capitation tax authorized by the constitution of 1848. During this period the legislature raised necessary revenues only through taxation on property, and license fees or taxes on occupations, franchises and privileges. These same sources were likewise provided as the exclusive sources of revenue in the constitution of 1870.

As evidence of the purpose of the framers of our present constitution to limit the legislature to the same sources of revenue to which it had been limited by the constitution of 1848, the address of the chairman of the committee on revenue is pertinent. In Debates of the Constitutional Convention of 1870, chairman Hay, after referring to the fact that the poll tax authorized in 1848 had been a dead letter, said (p. 1195): "Another portion of the committee were of the opinion that the whole principle of the collection of a poll tax was wrong in theory; that the true method of collecting a tax for revenue purposes was by a tax upon property according to its value; that any other mode of collecting a tax was erroneous in theory, and hence a very considerable majority in the committee concurred in striking out that provision in the existing constitution. They then passed on to what may be denominated as the fundamental provision of the existing constitution in regard to the mode of assessing and collecting revenues, and that they embodied in this section. After mature reflection the committee did not believe they could improve, nor do they believe that any attempt that may be made upon the part of this committee or this convention can result in any improvement upon the principle of taxation as provided in the equivalent provision in our existing constitution with regard to the mode of collecting revenue by assessments according to the value of property. They have, therefore, simply followed the existing constitution in this second section, with a little addition in respect to certain classes of business covered by the proviso in that section. It is not necessary to detail the reasons why this was done."

The omission of a provision for a poll tax or capitation tax in the constitution of 1870, and the expressed specification in section 1 of article 9 of the 1870 constitution, which was the old section 2 of the 1848 constitution, providing that the General Assembly should raise all needful revenue by levying property taxes on an *ad valorem* basis,

with the exception for a tax on occupations, franchises and privileges, make it clear that section 1 of article 9 of the constitution of 1870 is a limitation on the power of the legislature to raise revenue, confining it to (1) property taxes on a valuation basis; (2) occupation taxes; and (3) franchise or privilege taxes. It is also clear that this court, in construing section 1 of article 9 of our constitution, recognized the fact that the constitution limits taxation to a general property tax to be based upon value, and that such provision in the constitution was for the purpose of insuring equality in the levying and collection of taxes to support the government, whether levied for State, county or municipal purposes. (*People's Loan and Homestead Ass'n* v. *Keith,* 153 Ill. 609, and cases cited.) This conclusion is fortified by numerous decisions of this court both before and after the constitution of 1870 was adopted. Briefly reviewed, we find that in 1855 this court held that it was not the purpose of section 2 nor of section 6 of article 9 of the 1848 constitution (now sections 1 and 2 of article 9 of the present constitution) to permit taxation of incomes; (*Illinois Central Railroad Co.* v. *County of McLean,* 17 Ill. 291;) that the power to tax "other objects and subjects" under section 6 of article 9 of the 1848 constitution was limited to the taxation of such other objects and subjects by the *ad valorem* principle, "except in the cases specified in the last part of section 2," (that is, occupations, franchises and privileges,)· "where the legislature is authorized to depart from the *ad valorem* principle." (*People* v. *Worthington, supra;*) that under the 1848 constitution the principle of equality and uniformity, based on valuation, was the rule governing the levy and collection of taxes; (*O'Kane* v. *Treat,* (1861) 25 Ill. 458;) that "every species of taxation" must be apportioned on the principle of "equality and uniformity" determined by "valuation," and that there did "not exist, either in the legislature or in any of the subdivisions of State sovereignty, a

power of apportioning taxes, whether of a general or of a local character, except on" this principle; (*City of Chicago* v. *Larned*, (1864) 34 Ill. 203; *Lee* v. *Ruggles*, (1872) 62 id. 427;) and that the constitution of 1848 placed "limitations * * * upon the sovereign power * * * of taxation, * * * by requiring uniformity and valuation to be the standard." *Rich* v. *City of Chicago*, (1871) 59 Ill. 286.

The failure of the framers of the 1870 constitution to include in it any express authorization for an income tax is further accentuated by their granting authority to the legislature respecting special assessments. We are thus warranted in assuming that the constitutional convention, having made no change with reference to the income tax, intended the former construction of its revenue provisions to stand, especially where "a change [was] made in reference to making special improvements by special taxation on contiguous property, to obviate the effects of decisions of this court on that subject." (*Lovingston* v. *Board of Trustees*, 99 Ill. 564.) The provisions of each constitution being the same, they will admit of but one construction. *Braun* v. *City of Chicago*, 110 Ill. 186; *People* v. *Knopf*, 171 id. 191.

The appellants have cited numerous decisions of this court to sustain their argument that the authority conferred by section 2 of article 9 of the present constitution is sufficient to sustain the present Income Tax law. This section, it will be remembered, provides that "the specification of the objects and subjects of taxation shall not deprive the General Assembly of the power to require other subjects or objects to be taxed," etc. We have examined these citations relied upon, (*Howland* v. *City of Chicago*, 108 Ill. 496; *Kochersperger* v. *Drake*, 167 id. 122; *Price* v. *People, supra; Bessette* v. *People*, 193 Ill. 334; *Harder's Storage Co.* v. *City of Chicago*, 235 id. 58; *Metropolis Theatre Co.* v. *City of Chicago*, 246 id. 20; *Condon* v. *Village of*

*Forest Park,* 278 id. 218; *McGrath* v. *City of Chicago,* 309 id. 515; *People* v. *Deep Rock Oil Corp.* 343 id. 388;) but do not find any of them relevant, since they all pertain to taxes or license fees either upon occupations, franchises or privileges, and it is not claimed that an income tax falls within any of these classifications. On the other hand, by an unbroken chain of authorities this court has consistently interpreted the plain and unambiguous language of the constitution, by which all needful revenue shall be raised "by levying a tax by valuation, so that every person and corporation shall pay a tax in proportion to the value of his, her or its property," as intended to cast the burdens of taxation equally upon all property of every description in the State. (*Republic Life Ins. Co.* v. *Pollak,* 75 Ill. 292; *Ramsey* v. *Hoeger,* 76 id. 432; *Howe* v. *People,* 86 id. 288; *Law* v. *People,* 87 id. 385; *Cole* v. *Hall,* 103 id. 30; *City of Chicago* v. *Fishburn,* 189 id. 367; *People's Gas Light and Coke Co.* v. *Stuckart,* 286 id. 164; *School of Domestic Arts and Science* v. *Carr,* 322 id. 562; *People* v. *Nelson,* 344 id. 46.) And we have just as consistently refused to extend those constitutional provisions beyond the clear import of the language employed where the tax imposed was not a tax upon property or did not fall within the exception contained in section 9 of article 9 respecting special assessments or special taxes for local improvements, (*Kuehner* v. *City of Freeport,* 143 Ill. 92; *People* v. *Cook County Comrs.* 221 id. 493;) or where it was not of the supplementary character of special taxes or license fees on occupations, franchises and privileges specifically authorized by section 2 of article 9 of the constitution.

We come now to a consideration of whether "income" is property. The overwhelming weight of judicial authority holds that it is. The cases of *Eliasberg Bros. Mercantile Co.* v. *Grimes,* 204 Ala. 492, 86 So. 56, *Tax Commissioner* v. *Putnam,* 227 Mass. 522, 116 N. E. 904, *Stratton's Independence* v. *Howbert,* 231 U. S. 399, 34 Sup. Ct. 136,

*Doyle* v. *Mitchell Bros.* 247 U. S. 179, 38 Sup. Ct. 467, *Board of Revenue* v. *Montgomery Gas Co.* 64 Ala. 269, *Greene* v. *Knox*, 175 N. Y. 432, 67 N. E. 910, *Hibbard* v. *State*, 65 Ohio St. 574, 64 N. E. 109, *Ludlow* v. *Woolbrinck*, 275 Mo. 339, 205 S. W. 196, and *State* v. *Pinder*, 108 Atl. 43, define what is personal property and in substance hold that money or any other thing of value acquired as gain or profit from capital or labor is property, and that, in the aggregate, these acquisitions constitute income, and, in accordance with the axiom that the whole includes all of its parts, income includes property and nothing but property, and therefore is itself property.

The question then arises whether our constitution is broad enough in its terms to permit the legislature to pass a graduated tax to be levied upon the income of residents of Illinois, from whatever source derived, and a similar tax upon non-residents of Illinois from sources in Illinois, and a similar tax upon fiduciaries on income from the assets in their hands which are distributed during the taxable year. This same question arose in the State of Wisconsin, where the constitutionality of a similar law was contested. The constitution of that State before it was amended in 1905 and 1907 contained only one brief section on the general subject of taxation, which read as follows: "The rule of taxation shall be uniform and taxes shall be levied upon such property as the legislature shall prescribe." The legislature of Wisconsin passed a resolution recommending that the above quoted section of the Wisconsin constitution be amended by adding thereto the following words: "Taxes may also be imposed on incomes, privileges and occupations, which taxes may be graduated and progressive, and reasonable exemptions may be provided." This change in the Wisconsin constitution was ratified by the people at a general election held in that State in 1908, and the Supreme Court of Wisconsin, in the case of *State* v. *Frear*, 148 Wis. 456, 134 N. W. 673, said: "Thus was clearly expressed

by both legislature and the people the idea that some form of general taxation in addition to, or in place of, property taxation might well be adopted. The attempt has now been made to carry out this idea, and we have the result before us in the present law. With the political or economic policy or expediency of the law we have nothing to do. If it be within constitutional lines it represents and embodies public policy, because it is enacted by that branch of the government which determines public policy. * * * The question here is primarily of the power of the legislature of Wisconsin, under its constitution, to levy an income tax in addition to a real estate tax, and secondarily, whether such a tax denies to anyone the equal protection of the laws. * * * There can be no doubt of the proposition that income taxation of a progressive character, in addition to taxation of property, is directly authorized by the constitution of Wisconsin as amended in 1908. Words could hardly be plainer to express the idea than the words used. From them it clearly appears that taxation of property and taxation of incomes are recognized as two separate and distinct things in the State constitution. Both may be levied, and lawfully levied, because the constitution says so." It is therefore apparent that the Supreme Court of Wisconsin declared the graduated income tax of that State constitutional, solely upon the ground that the constitution, by reason of the amendment made in 1908, was broad enough to include the imposition of a tax on "incomes, privileges and occupations, which taxes may be graduated and progressive, and reasonable exemptions may be provided."

The States of Arkansas, Delaware, Georgia, Idaho, Mississippi, Missouri, New York, North Carolina, North Dakota, Oklahoma, Oregon, South Carolina, Tennessee, Utah, Vermont, Virginia, Wisconsin and Illinois have statutes providing for income taxes on individuals. In the State of Wisconsin, and in some of the other States, the

constitution is broad enough to authorize the legislature to pass a graduated income tax, while in New York, as well as some of the other States, the constitution places no restriction upon the legislature relative to revenue, except a limitation as to the bonded indebtedness of the State and the political divisions thereof.

In construing the constitution of Illinois as to what property is subject to taxation this court has held in a number of cases that "property" includes real estate, tangible personal property and intangible rights of value. We have given a broad meaning to the word "property" as used in the constitution. Thus, in *People* v. *Worthington, supra,* this court said: "The word 'property' is not alone used in our language to denote tangible things but is properly applied to denote intangible rights of value. One may have a property in a patent right or a copyright which is as much ideal as is a right of action. We may safely assume that it was the policy of the convention which framed this clause of the constitution, that each person pay a direct tax in proportion to the pecuniary interests which he has in the State, and to be protected and defended by the laws."

In the cases of *Carrington* v. *People,* 195 Ill. 484, *Easton* v. *Board of Review,* 183 id. 255, and *Wedgbury* v. *Cassell,* 164 id. 622, this court held that leasehold estates in State lands, city warrants and certificates of purchase at mortgage foreclosure sale are taxable and come within the provisions of the constitution. The capital stock and franchise of a corporation are property within the meaning of the constitution and as such are subject to taxation. (*Porter* v. *Rockford, Rock Island and St. Louis Railroad Co.* 76 Ill. 561; *Ottawa Glass Co.* v. *McCaleb,* 81 id. 556.) Coal rights, either as a part of the land or separately, are taxable, and if the same person owns both the land and the coal rights, it is proper, in assessing the land, to add thereto the value of the coal rights. (*Consolidated Coal Co.* v. *Baker,* 135 Ill. 545.) "Property" includes everything which

goes to make up one's wealth or estate. (*Carlton* v. *Carlton,* 72 Me. 115, 39 Am. Rep. 307.) Salary of an office is property. (*Greene* v. *Knox, supra; Hibbard* v. *State, supra.*) A tax upon the income of property is in reality a tax upon the property itself. Income derived from property is also property. Property by income produces its kind—that is, produces property and not something different. (*Opinion of Justices,* 220 Mass. 613, 108 N. E. 570; *Pollock* v. *Farmers' Loan and Trust Co.* 157 U. S. 427.) In the latter case the court said: "The name of the tax is unimportant. The real question is, Is there any basis upon which to rest the contention that real estate belongs to one of the two great classes of taxes and the rent or income which is the incident of its ownership belongs to the other? We are unable to perceive any ground for the alleged distinction. An annual tax upon the annual value or annual user of real estate appears to us the same in substance as an annual tax on the real estate, which would be paid out of the rent or income. * * * The law, so far as it imposes a tax upon land by taxation of the rents and income thereof, must therefore fail, as it does not follow the rule of apportionment. The constitution is imperative in its directions on this subject and admits of no departure from them."

As heretofore shown, the word "property" as used in our constitution includes income, and income is "property." Therefore it necessarily follows that under the constitution of this State all taxes must be levied on property by valuation, so that every person and corporation shall pay a tax in proportion to the valuation of his or its property. The 1932 Income Tax law is an attempt to levy a tax upon property (income) by means of a graduated scale that increases in rate as applied to increases from property and personal earnings. It therefore violates the constitutional provision that all taxes must be levied on property according to valuation. It is not uniform in its operation and does not equal-

ize the burden of taxation, as required by the constitution. It is a proposed tax on property by graduation rather than by valuation. Whether this law would be desirable from an economic standpoint or as a matter of public policy is something of which this court can take no cognizance, as we are clothed with the power and primarily entrusted with the duty of maintaining the fundamental law of the constitution, which in its present form confers no legislative authority for the enactment of the proposed graduated Income Tax act.

For the reason above stated no necessity exists for a consideration of the numerous other objections made to the validity of the act in question so far as the Illinois constitution is concerned. But there are vital objections to certain sections or parts of the act as violative of the Federal constitution which should not be ignored. Section 11 of the act is contrary to section 1 of the fourteenth amendment to the constitution of the United States. This section allows certain credits on income taxes levied by the act on non-residents, depending upon similar provisions being made in sister States. In *Travis* v. *Yale & Towne Manf. Co.* 252 U. S. 60, the Supreme Court of the United States declared such a provision discriminatory and unconstitutional. Section 15 of the act prescribes an additional penalty for the failure of non-residents to file an income tax return. This section requires a non-resident to file a return of his income, not only from sources in Illinois but also from sources outside of Illinois. His failure to file such a return, whether willful or fraudulent, results in a denial to the non-resident of all deductions authorized by the act, including ordinary and necessary expenses, interest paid, taxes paid to the United States and other governmental bodies, losses, etc., as provided in section 8 of the act. In addition to this the non-resident is subjected to all the penalties of fine and imprisonment to which the resident of Illinois is subjected. This is a discrimination against non-

resident tax-payers and is in violation of section 1 of the fourteenth amendment to the Federal constitution because it denies to the non-resident equal protection of the laws of Illinois and does not guarantee to the non-resident the same privileges and immunities as are given to the citizens of this State.

The decree of the circuit court of Sangamon county is affirmed.

*Decree affirmed.*