(No. 66213.—)

FEDERATED DISTRIBUTORS, INC., *et al.*, Appellees, v. J. THOMAS JOHNSON, Director of Revenue, *et al.*, Appellants.

*Opinion filed October 20, 1988.*

2

MILLER, J., specially concurring.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and Ann Plunkett-Sheldon, Louise M. Calvert and Michael J. Wynne, Assistant Attorneys General, all of Chicago, of counsel), for appellants.

Russ M. Strobel and Edward J. Lewis II, of Jenner & Block, William J. Harte, of William J. Harte, Ltd., and Richard J. Prendergast, of Richard J. Prendergast, Ltd., all of Chicago, for appellees.

George A. Joseph, Robert J. Kopecky and Chaim T. Kiffel, of Kirkland & Ellis, of Chicago, for *amicus curiae* Anheuser-Busch.

Samuel K. Skinner, Thomas A. Roberts and Sally Hewitt, of Sidley & Austin, of Chicago, for *amicus curiae* Wine Institute.

JUSTICE CLARK delivered the opinion of the court:

Federated Distributors initiated this action as a challenge to the Department of Revenue's ruling that Federated, a distributor of a low-alcohol-content beverage, must pay taxes on that beverage based solely on the

method of production of the alcohol it contained. The trial court granted the Department of Revenue's (the Department's) motion for summary judgment and thereby upheld the constitutionality of the Department's classification of appellees' low-alcohol beverage (New Products) as "alcohol and spirits" and its tax of New Products at the rate of $2 per gallon under the Liquor Control Act of 1934 (the Act) (Ill. Rev. Stat. 1985, ch. 43, par. 93.9 *et seq.*). The appellate court reversed and found that New Products had "no real and substantial difference" from products known and marketed as wine coolers and should, therefore, be taxed at the same rate as wine and wine coolers. (163 Ill. App. 3d 27, 35.) Appellants are before this court pursuant to Supreme Court Rule 315(a) (107 Ill. 2d R. 315(a)).

The underlying question presented for our review is whether manufacturers and importing distributors of "New Products" should constitutionally be taxed at the same rate as wine and wine coolers or at a rate which is over eight times higher than that pursuant to the Department's interpretation of the tax classification system in the Liquor Control Act (Ill. Rev. Stat. 1985, ch. 43, par. 158). In order to answer this question, we must determine whether the "real and substantial differences" test is the appropriate measure to assess the constitutionality of the tax imposed on the manufacturers and importing distributors of New Products pursuant to the Liquor Control Act and, if that is the appropriate test, whether there is a real and substantial difference between New Products and wine coolers. Our review will require an analysis of the taxation limitations imposed under the Illinois Constitution of 1970.

The relevant portions of the Liquor Control Act (Ill. Rev. Stat. 1985, ch. 43, par. 93.9 *et seq.*) to be considered are the following:

"§1—2. This Act shall be liberally construed, to the end that the health, safety and welfare of the People of the State of Illinois shall be protected and temperance in the consumption of alcoholic liquors shall be fostered and promoted by the sound and careful control and regulation of the manufacture, sale and distribution of alcoholic liquors." Ill. Rev. Stat. 1985, ch. 43, par. 94.

"§1—3.02. 'Spirits' means any beverage which contains alcohol obtained by distillation, mixed with water or other substance in solution, and includes brandy, rum, whiskey, gin, or other spiritous liquors, and such liquors when rectified, blended or otherwise mixed with alcohol or other substances." Ill. Rev. Stat. 1985, ch. 43, par. 95.02.

"§1—3.03. 'Wine' means any alcoholic beverage obtained by the fermentation of the natural contents of fruits, or vegetables, containing sugar, including such beverages when fortified by the addition of alcohol or spirits, as above defined." Ill. Rev. Stat. 1985, ch. 43, par. 95.03.

"§8—1. A tax is imposed upon the privilege of engaging in business as a manufacturer or as an importing distributor of alcoholic liquor other than beer at the rate of 23¢ per gallon for wine containing 14% or less of alcohol by volume, 60¢ per gallon for wine containing more than 14% of alcohol by volume, and $2.00 per gallon on alcohol and spirits manufactured and sold or used by such manufacturer, or as agent for any other person, or sold or used by such importing distributor, or as agent for any other person. A tax is imposed upon the privilege of engaging in business as a manufacturer of beer or as an importing distributor of beer at the rate of 7¢ per gallon on all beer manufactured and sold or used by such manufacturer, or as agent for any other person, or sold or used by such importing distributor, or as agent for any other person." Ill. Rev. Stat. 1985, ch. 43, par. 158.

The relevant portions of the Illinois Constitution applicable to consideration of this case include the following provision:

"In any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds and other allowances shall be reasonable." Ill. Const. 1970, art. IX, §2.

Appellees are manufacturers or importing distributors of low-alcohol-content beverages which have been characterized by the lower court as "New Products." A description and definition of the New Products beverages has been stipulated to by all parties:

"New Products are not produced by either distillation or fermentation, but contain not less than one-half of one percent (1/2 of 1%) and not more than fourteen percent (14%) alcohol by volume. They are produced from any combination of water, flavoring, fruit juices, vegetable juices, sugar, sugar syrup, preservatives and artificial carbonation, and are fortified by the addition of spirits."

The record also indicates that New Products compete for sales with other products which are virtually identical in all material respects, including percentage alcohol content and ingredients, except that these other products, known commercially as wine coolers, are fortified by the addition of wine rather than spirits. In essence, the difference between New Products and wine coolers rests solely in the type of alcohol which each contains.

Proceedings below began when appellees contacted the Illinois Department of Revenue, requesting a ruling to establish the amount of the tax the Department would assess against the manufacturers and importing distributors of New Products under article VIII of the Liquor Control Act (Ill. Rev. Stat. 1985, ch. 43, par. 158 et seq.). By letters issued from the Legal Services Bureau of the Department on March 24, 1986, and April 24, 1986, appellees were informed and subsequently assured that the manufacturers and importing distributors of this new

beverage would be taxed in the same category as wine coolers, the product to which they were most closely analogous, that tax amounting to $0.23 per gallon under the current statute. On May 29, 1986, a little over two months after its first ruling, the Department rescinded its prior positions and informed appellees that their beverage "technically" fell within the statutory definition of "spirits" and that manufacturers and importing distributors would therefore be taxed at the rate of $2 per gallon. Appellees thereupon filed a motion for preliminary injunction seeking to enjoin the imposition of the $2 per gallon tax on New Products, asserting that the beverage could be taxed constitutionally only at the rate assessed to wine containing less than 14% of alcohol by volume or, in the alternative, not taxed at all. In support of the lower tax rate, appellees asserted that the plain purpose of the Act, to promote temperance in the consumption of alcohol, could only be furthered by taxing New Products at the lower rate. The trial court, however, agreed with the Department's "technical" reading of the Act and upheld the constitutionality of the $2 per gallon tax on New Products. The trial court found that the Act was regulatory in nature and that it established classifications on a reasonable basis that were not arbitrary.

The appellate court reversed the trial court and ordered that New Products be taxed at the same rate applicable to wine and wine coolers, that is, at $0.23 per gallon. The court concluded that the intent of the legislation, to promote temperance in the consumption of alcohol, which is carried out and supported through imposition of a scheme that taxes manufacturers of low-alcohol beverages at lower rates, could be furthered only by taxing New Products at the lower rate established for wine. The court stated that it found no real and substantial difference between the ingredients and alcoholic content in New Products and those in wine coolers. Additionally,

the court concluded that placement of New Products in the "spirits" category would bear no rational relationship to the evil sought to be remedied by the Act. (163 Ill. App. 3d at 35.) Alcohol is alcohol, the court in essence said, differentiated only by the process in which it is made. Because the Act regulates alcohol, "[t]o differentiate between two nearly identical alcoholic beverages based only on the process or method used to produce a single ingredient in beverages constitutes an unreasonable and illogical interpretation of the Act." 163 Ill. App. 3d at 33.

In urging this court to reverse the appellate court, the Department asserts that the Act's tax classification is based on the method of production; that, based on the "method of production" classification, there is a real and substantial difference between New Products and wine coolers; that the tax imposed in the Act is regulatory; and that because the tax imposed by the Act is regulatory, the real and substantial differences test should not even be applied in determining the constitutionality of the tax but rather that the only question is one of whether the tax is arbitrary and unreasonable. Based on the validity of the method-of-production regulatory taxation scheme, the Department contends that manufacturers and importing distributors of New Products must be taxed at the rate of $2 per gallon. Appellees argue that the imposition of a $2 per gallon tax on New Products is violative of the constitutional guarantees of uniformity, due process and equal protection as well as being contrary to the stated purpose of the Act. When the Department's petition for leave to appeal was granted, we allowed Anheuser-Busch, Inc., and the Wine Institute to file *amicus curiae* briefs in support of the Department of Revenue's position.

We today hold that, while the majority of the Liquor Control Act is regulatory in nature, article VIII of the

Act is a tax for revenue purposes and is therefore subject to the uniformity clause of the Illinois Constitution of 1970. We agree with the appellate court that there is no "real and substantial difference" between New Products and wine coolers and that therefore manufacturers and import distributors of both products must be taxed at the same rate. That that rate must be the same as the rate for wine is not so inherently clear, nor is it in the purview of this court to establish an appropriate rate; that task lies with the legislature. We merely conclude that manufacturers and importing distributors of New Products cannot be taxed at a rate different than the rate applied to manufacturers and importing distributors of wine coolers. Because we find that the taxation of New Products at $2 per gallon violates the uniformity clause, we need not address appellees' due process and equal protection claims. We reject appellees' alternative contention that manufacturers and importing distributors of New Products are not subject to the taxation scheme at all. The "object, spirit and meaning of the statute" is to tax alcoholic beverages (*U.S. Industrial Alcohol Co. v. Nudelman* (1940), 375 Ill. 342, 345), and New Products concededly fall within the classification of alcoholic beverage. Additionally, we conclude that to the extent that section 8—1 of the Act (Ill. Rev. Stat. 1985, ch. 43, par. 158) does not establish a basis on which to tax equally manufacturers and importing distributors of these virtually identical products, it violates article IX, section 2, of the Illinois Constitution.

The Illinois Constitution of 1970 included a new revenue provision requiring that any classification of non-property taxes or fees be reasonable and that taxes within each class be uniform. (Ill. Const. 1970, art. IX, §2.) Although the due process clauses of the Federal and State Constitutions and the equal protection clause of the Federal Constitution had previously served as limita-

tions upon unreasonable classifications (7 Record of Proceedings, Sixth Illinois Constitutional Convention 2072 (hereinafter cited as Proceedings) (Committee on Revenue and Finance Proposal Number 2, *Section 2—Nonproperty Taxes—Classification, Exemption, Deductions, Allowances and Credits*)), the Committee believed that the taxpayers of Illinois should receive additional protection:

> "Uniform treatment of unlike classes is just as unreasonable as non-uniform treatment of like classes. *** Classification is essential. It is also essential that the General Assembly be bound by a standard of reasonableness. The federal due process and equal protection clauses provide a minimum standard. [Citation.] The Committee believes, however, that Illinois taxpayers should receive added protection in the state constitution.

> It is not possible to write a detailed definition of reasonable classification into the constitution without risking omissions or interpretations which would so restrict future actions as to negate the very purpose of the classification authority. The Committee recommendation leaves the Illinois courts free to apply standards of reasonableness which are more rigorous than those developed under the federal constitution, but avoids the rigidity which could result from an effort to write a specific definition into the constitutional document." 7 Proceedings 2074.

The Committee recognized that changing times bring changing conditions. Just as the Committee recognized the reality of change and drafted a constitution flexible enough to account for such, so, too, must this court be aware of societal changes, developments and growth in knowledge and understanding as we approach the task of determining the constitutionality of a particular statute. "Standards of reasonableness" are not static rules engraved in stone, but norms fully attuned to the developing conscience of a people.

The uniformity clause of the Illinois Constitution applies, by its terms, to "any law classifying the subjects or objects of non-property taxes or fees." (Ill. Const. 1970, art. IX, §2.) The Department contends that the Liquor Control Act in its entirety is regulatory and that therefore the uniformity clause does not apply. We need not address the issue here, as we find that article VIII of the Liquor Control Act is a tax measure enacted under the taxing power of the State.

As our court noted in *Crocker v. Finley* (1984), 99 Ill. 2d 444, both the police power and the power to tax may be incorporated into the same statute (99 Ill. 2d at 457). This fact was also recognized by our court as early as 1938 in a case that specifically discussed provisions of the Liquor Control Act. This case, *Bardon v. Nudelman* (1938), 369 Ill. 214, has not been reversed or distinguished, and yet, interestingly enough, even though on point, was not cited by any party to this action. *Bardon* involved a challenge to the enforcement of the retailers' occupation tax (Ill. Rev. Stat. 1937, ch. 120, pars. 440 through 453) against appellants who were licensed retail liquor dealers. (369 Ill. at 215.) Appellants contended that the tax imposed by the Retailers' Occupation Tax Act and the license fees imposed under sections 1 and 4 of article V of the Liquor Control Act were in effect double taxation. In rejecting appellants arguments alleging double taxation, our court noted that "the Liquor Control Act is *primarily* an exercise of the police power" (emphasis added) (369 Ill. at 216) before describing the regulatory scope of articles I, III, IV, V, VI, VII and X in the Act. Our court then concluded the description of the Liquor Control Act by noting the following:

> "The Liquor Control Commission is vested with power to administer the regulatory provisions [above noted] of the act. Article 8 is the only provision of this act which levies a tax *purely for revenue*. This article is administered by

the Department of Finance and levies a tax only upon manufacturers and importing distributors of alcoholic liquors, and these taxes are declared to be in addition to all other occupation or privilege taxes imposed by the State, municipal corporations, or subdivisions thereof." (Emphasis added.) (369 Ill. at 216.)

Although the language in *Bardon* regarding article VIII is *dicta*, our court has never disavowed it. The Department, in its briefs and arguments, relied on *Lalumio v. Fasseas* (1960), 21 Ill. 2d 135, for the proposition that the entire Liquor Control Act is regulatory. *Lalumio*, like *Bardon* before it, specifically concerned the licensing portion of the Liquor Control Act (Ill. Rev. Stat. 1959, ch. 43, par. 118) and therefore cited to and relied on the holding in the *Bardon* case as it pertained to the regulatory portions of the Act. (*Lalumio*, 21 Ill. 2d at 138.) *Lalumio*, however, did not deal with nor mention article VIII of the Act nor did it mention *Bardon*'s discussion of article VIII, the "purely for revenue" provision. (369 Ill. at 216.) It therefore was not a rejection of the *Bardon* court's interpretation of the entire Act.

That article VIII of the Liquor Control Act is a revenue measure under the taxing authority of the State is further supported by a review of the historical development of the taxation of alcohol in general and of the Liquor Control Act in particular. First, on the Federal level, alcoholic beverages were originally taxed as a temporary revenue measure to raise funds for payment of war debts. Alexander Hamilton, the Secretary of the Treasury under President Washington, first initiated a tax in 1791 to help pay the Revolutionary War debt. The law and tax was, however, very unpopular and was repealed when Thomas Jefferson became President. By 1813 the nation was again faced with immense war debts to support the War of 1812; a temporary revenue raising measure was therefore enacted which again

taxed alcohol for the next four years. It was during the Civil War that the predecessor to our present internal revenue statute was created when, in 1862, Congress passed an act to raise revenue for the war effort. However, unlike prior acts, this measure was not temporary. See generally S. Baron, Brewed in America, A History of Beer & Ale in the United States (1962); E. Kellner, Moonshine, Its History & Folklore (1971).

While on the Federal level, alcoholic beverages were being taxed for revenue purposes, on the State level other concerns took precedence. In Illinois the predecessor to our Liquor Control Act was passed in 1874 as "An act to provide for the licensing of, and against the evils arising from the sale of intoxicating liquors." Approved on March 30, 1874, it became effective July 1, 1874. (Ill. Rev. Stat. 1874, ch. 43, pars. 1 through 15 (Dram Shop Act of 1874).) Although this initial act was only a licensing and regulating measure, it did provide the definitions of "alcohol," "spirits," "wine" and "beer" that stand almost verbatim in today's Liquor Control Act. (Compare Ill. Ann. Stat., ch. 43, par. 95, Historical Note (Smith-Hurd 1986), with Ill. Rev. Stat. 1985, ch. 43, pars. 95.01 through 95.04.) The individual products, since the original Dram Shop Act of 1874, have each been defined by the processes which produced them, i.e., distillation and fermentation.

Following the repeal of prohibition in 1933, the Illinois legislature enacted the Liquor Control Act of 1934, which greatly expanded the scope of the Dram Shop Act of 1874. The new act not only licensed and regulated, but also incorporated a separate section (article VIII) to provide for a tax to be paid by the manufacturers and importing distributors of alcoholic beverages—an occupation tax. While legislative records of the 1930's do not contain the transcripts of the debates nor a statement of the rationale for proposed statutory provisions such as

may be found for current measures, the historical reality of that time supports the imposition of a State revenue-raising measure. In 1934 the country as a whole was not only emerging from the tempest of prohibition, but was also crawling out from the depths of the effects of the depression. Not only would the legislature have felt the need to control and regulate the consumption of alcohol in order to promote temperance following prohibition, but it would also have been faced with the need to raise revenue following the devastating effects of the depression. Combining a regulatory measure and a revenue-raising tax measure in one statute would provide solutions for both problems. To distinguish the licensing provisions from the taxing provisions, the legislature provided that license fees be paid to the Illinois Liquor Control Commission (Ill. Rev. Stat. 1937, ch. 43, par. 118) and subsequently added a provision for deposit into the Dram Shop Fund (Ill. Rev. Stat. 1979, ch. 43, par. 118). By contrast, the taxes paid under article VIII were to be paid to the Department of Finance (the Department of Revenue after 1943) with no stipulation as to deposit into a specific fund. Ill. Rev. Stat. 1937, ch. 43, par. 158.

It is undisputed that the State, through the legislature, has the power to tax. (*Reif v. Barrett* (1933), 355 Ill. 104, 110.) At the time the Liquor Control Act was enacted in 1934, however, the State's authority to levy taxes was limited by this court's interpretation of the State Constitution to a levy of taxes in only three specific areas: (1) property taxes on valuation basis; (2) occupation taxes; and (3) franchise or privilege taxes. (*Bachrach v. Nelson* (1932), 349 Ill. 579.) Because a revenue-raising tax could only survive a constitutional attack if it fell within one of the three enumerated categories, the tax levied as part of the Liquor Control Act was initiated as an occupation tax. *Bachrach* was subsequently

overruled, and the State has since adopted a new constitution in which the drafters noted the importance of avoiding the former limitations imposed on the State's power to raise revenues through taxes. See Young, *The Revenue Article of the Illinois Constitution of 1970—An Analysis and Appraisal*, 1972 U. Ill. L.F. 312.

While the 1970 Illinois Constitution sought to eliminate the rigidity such decisions as *Bachrach* imposed on the State's power to raise revenue through taxes, it also clearly intended to provide for uniform taxation. (Ill. Const. 1970, art. IX, §2.) Our court recognized in *Searle Pharmaceuticals, Inc. v. Department of Revenue* (1987), 117 Ill. 2d 454, that the Illinois Constitution's uniformity clause provides greater protection for State taxpayers than does the equal protection clause. (117 Ill. 2d at 466-67.) The validity of a tax classification under the uniformity clause is to be determined based on the "real and substantial differences" test and on whether the classification bears some reasonable relationship to the object of the legislation or to public policy. 117 Ill. 2d at 468.

Is there a real and substantial difference between New Products and wine coolers that would permit their manufacturers to be taxed at different rates? We answer that question in the negative.

New Products and wine coolers are different in only one respect—the source of their alcoholic content. According to the record, New Products is "fortified by the addition of spirits," while a wine cooler's alcoholic content is derived from the addition of wine to the fruit juices. That difference alone, assert the appellants, is a real and substantial difference which is supported by the statutory definitions of "wine" and "spirits." We do not agree that the difference is a real and substantial one.

To assert that by definition "spirits," "wine" and "beer" bear no relationship and are not dependent for

their essence on their alcoholic content, but are based solely on the method of their production, is to ignore the fact that the very nature of the product and the method of production determine the alcoholic content. Method of production and percentage of alcoholic content are so intertwined as to be inseparable. The percentage of alcohol is, in essence, a silent modifier of the product type and its method of production. Our research indicates that production of a specific product (beer, wine or spirits) determines the alcoholic content. In other words, below or above certain alcoholic percentages, beer will not be beer and wine will not be wine.

As early as 1887 members of the judiciary took note of the fact that:

> "[a]lcohol *** has but one source—the fermentation of sugar and saccharine matter. It comes through fermentation of substances that contain sugar proper, or that contain starch, which may be turned into sugar. All substances that contain either sugar or starch, or both, will produce it [alcohol] by fermentation. It is a mistake to suppose, as many persons do, that it is really produced by distillation. It is produced only by fermentation, and the process of distillation simply serves to separate the spirit—the alcohol[—]from the mixture, whatever it may be, in which it exists." (*State v. Giersch* (1887), 98 N.C. 720, 723-24.)

A few years later a Wisconsin court noted that all "[a]lcohol is a product of fermentation. Malting is a process preliminary to fermentation. Alcohol is separated, not produced, by distillation, and the liquor thus separated containing a percentage of alcohol is called spirituous liquor." (*Pennell v. State* (1909), 141 Wis. 35, 38, 123 N.W. 115, 116.) Our Illinois statute defines beer as "a beverage obtained by the alcoholic fermentation of an infusion or concoction of barley, or other grain, malt, and hops in water." (Ill. Rev. Stat. 1985, ch. 43, par. 95.04.) Both beer and wine are produced by fermentation (com-

pare the definition of beer (Ill. Rev. Stat. 1985, ch. 43, par. 95.04), with the definition of wine (Ill. Rev. Stat. 1985, ch. 43, par. 95.03)), yet the average alcoholic content of beer is 4% to 5% while the average alcoholic content of wine is 10% to 14%. (H. Hillman, The Gourmet Guide to Beer 166 (1983).) Why?

Beer begins with a cereal grain that contains starch: barley, corn, wheat, rice, oats, or rye. Through a process called malting, the grain is germinated and enzymes are produced that turn the starch into sugar. This germinating process must be halted before the sprouts use up the enzymes as the plant grows. The starch-turned-to-sugar malt is boiled and steeped with water before yeast is added which will ferment the product. (S. Brown, Wines & Beers of Old New England 48-49 (1978).) The yeast feeds upon the sugar and produces alcohol. The amount of alcohol that can be produced is directly dependent upon the amount of sugar present: "Yeast will usually continue to ferment the liquid either until it exhausts the sugar or until it is inhibited from further activity by the amount of alcohol which is formed." (Wines & Beers of Old New England, at 71-72.) The amount of sugar that can be obtained from the starch in the grains is limited and therefore the amount of alcohol is limited. It takes sugar to produce alcohol. (Wine & Beers of Old New England, at 70.) Therefore, thus limited, most beers do not contain an alcoholic content over 10%.

Wine is higher in alcoholic content because, as the statute describes, it is produced by the "fermentation of the natural contents of fruits, or vegetables, containing sugar." (Ill. Rev. Stat. 1985, ch. 43, par. 95.03.) Fruits contain a higher amount of natural sugar that can be converted into alcohol by yeast. Again, the strength of the wine is determined by the amount of sugar the yeast consumes, but generally speaking, 15% to 16% is the usual upper limit of alcoholic content for wine, and this

is only achieved by the addition of sugar to the mixture of fruit and water. Also, at the lower end of the scale, absent the use of new "de-alcoholizing" procedures currently being developed, an alcoholic wine containing less than 10% alcohol is unstable due to a sensitivity to bacterial spoilage. At or over 10% the alcohol level will prevent the growth of bacteria.

All alcohol begins from one of these two processes of fermentation. There is a high water content in both beer and wine; however, by separating the water from the alcohol a stronger drink can be obtained. Distillation, as a process, is based on the fact that alcohol vaporizes at a lower temperature (176 degrees Fahrenheit) than water. By heating the fermented liquids to a point slightly below 212 degrees Fahrenheit, the point at which water would vaporize, only the alcohol will be vaporized. Thus separated, it can be condensed to create a more potent beverage. (E. Kellner, Moonshine, Its History & Folklore, at 59 (1971).) Fermented cereal grains (as found in beer) may be distilled to whiskey, fermented fruits (as found in wine) may be distilled to brandy, and fermented sugar cane may be distilled to rum. The alcohol in spirits is thus *qualitatively* no different than the alcohol in wine—it has merely had some of its water content removed and is only *quantitatively* different. The process of distillation generally produces a product that is 40% to 50% alcohol by volume. (H. Hillman, The Gourmet Guide to Beer, at 166 (1983).) Is this quantitative difference enough to trigger the "real and substantial difference" test when the alcohol is mixed with fruit juices to create a product that is qualitatively no different than a wine cooler and which contains the same amount of alcohol by volume? The answer is no.

Article VIII of the Liquor Control Act sets out, at present, four different tax rates on manufacturers and importing distributors: one for beer, one for wine con-

taining under 14% alcohol by volume, one for wine containing over 14% alcohol by volume, and one for alcohol and spirits. The definitions for each of these products are found in article I of the Act and have been set out previously in this opinion. The Department has ruled that wine coolers, not explicitly described in the statute, be taxed at the same rate as wine containing under 14% alcohol by volume. The record indicates and the appellate court noted that New Products and wine coolers are "virtually identical in every aspect except one, the method in which the alcohol in each product is obtained." (163 Ill. App. 3d at 32.) The Department would ignore this virtual identity based on a statutory limitation which, it asserts, establishes taxation based solely on the method of production. Beer is generally beer at 3% to 10% alcohol by volume, wine is generally wine at 10% to 14% alcohol by volume (some dessert wines are fortified to a slightly higher alcoholic level by volume), and spirits are spirits when distilled to about 40% to 50% alcohol by volume. It is impossible to ignore this natural progression in alcoholic content by volume, which has its origin in the initial product fermented and in the process of production, or to ignore the fact that the statutory definitions of these products by method of production has remained unchanged since 1874. Though the definitions themselves remain accurate, taxation on manufacturers limited to a rigid application of these definitions to products which have only recently entered the market cannot meet the constitutional mandate of uniform taxation.

In reviewing a classification under the uniformity clause, not only do we look to whether there are any real or substantial differences, but we also examine the classification to determine if it bears a reasonable relationship to the object of the legislation or to public policy. (*Searle Pharmaceuticals, Inc. v. Department of Rev-*

*enue* (1987), 117 Ill. 2d 454, 468.) The Act has as a primary purpose the promotion of temperance in the consumption of alcoholic liquors. (Ill. Rev. Stat. 1985, ch. 43, par. 94.) In devising the taxation scheme in article VIII, the legislature has further supported that purpose of temperance by taxing manufacturers of products on a graduated scale that increases with the type of beverage, which is inextricably linked in method of production to the percentage of alcohol. Although defined by method of production, generally the scheme of taxation taxes lower alcohol level products at lower rates. We also note, moreover, that neither wine coolers nor New Products are "produced" by fermentation or distillation, but are manufactured by adding wine or spirits to fruit juices.

*Amici* contend that taxation of manufacturers of New Products and wine coolers at the same rate will destroy the entire statutory scheme because some imported beers may have the same alcoholic content as wine coolers and should also be taxed at the same rate, *i.e.*, $0.07 per gallon. This is a self-serving argument. It is well settled that the legislature has broad powers in the area of establishing classifications to define the subjects of taxation. (*Klein v. Hulman* (1966), 34 Ill. 2d 343.) Those broad powers, however, are limited in Illinois by the constitutional mandate of the uniformity clause. Uniformity need not necessarily dictate, however, that merely because two products have the same alcoholic content that they must be taxed at the same rate, *i.e.*, a 6% alcohol by volume beer and a 6% alcohol by volume wine cooler. A determination of real and substantial differences is not confined or limited to a review of only one aspect of a product, and in reaching our decision today we have not so limited our review to an examination of only the alcoholic level of the beverage, but have also looked to the overall similarity of the products. To return to appellants argument, beer and wine coolers are, as our prior discus-

sion indicates, very different products: one is made from grains and hops, the other begins with fruits and/or vegetables. Although both contain alcohol formed through the process of fermentation, beer must begin with the grain malted and is thereafter heated in the brewing process. Wine coolers contain fruit juices with some wine added to achieve a lower alcoholic content than is possible from wine alone. The products are very different.

Our holding today does not attempt to limit the constitutionality of the tax imposed by the Liquor Control Act to an application or determination of uniformity based solely on the percentage alcoholic content of the beverage. But where, as here, the products are virtually identical save for the method of production of their alcoholic content, they cannot constitutionally be taxed differently. While the method of production of alcohol may be one of the factors for determining a constitutional classification, it may not, as urged here by *amici* and the Department, be the sole basis for taxing virtually identical products at different rates. Indeed, as appellees point out, to tax these virtually identical low-alcohol products at different rates would frustrate the very purpose of the Act—to promote temperance in the consumption of alcohol.

In sum, we hold that article VIII of the Liquor Control Act is a revenue measure subject to the uniformity clause of the Illinois Constitution; that we find no real and substantial difference between New Products and wine coolers; and that, therefore, New Products must be taxed by the Department at the same rate established administratively for wine coolers. Although the Department has administratively ruled that wine coolers be taxed at the same rate as wine, we do not mean by this decision to say that wine coolers and New Products must constitutionally be taxed at the same rate as wine, and to that extent alone we reverse the appellate court. The

ultimate determination of taxation levels must be left to the legislature, to be determined within the constitutional limitations and to the end that they promote the purpose of the Act. To the extent that section 8—1 of the Liquor Control Act (Ill. Rev. Stat. 1985, ch. 43, par. 95.03) does not presently establish a basis on which to tax such virtually identical products equally, we declare it unconstitutional.

*Judgment affirmed in part;*
*reversed in part.*

JUSTICE MILLER, specially concurring:

I concur in the result reached by the majority. I write separately to emphasize the narrow scope of the holding in this case, and the need for legislative action on this subject.

I agree with the majority that the Department of Revenue's treatment of the item referred to by the plaintiffs as "New Products" is subject to the uniformity provision contained in article IX, section 2, of the Illinois Constitution (Ill. Const. 1970, art. IX, §2). Assuming that the uniformity provision is limited in scope to revenue measures and does not apply to licensing fees or other strictly regulatory measures imposed pursuant to the police power, I believe that there are adequate grounds for holding that the tax at issue in this case is a revenue measure and therefore subject to the uniformity requirement. The taxes imposed under article VIII of the Liquor Control Act of 1934 (Ill. Rev. Stat. 1985, ch. 43, pars. 158 through 165a) are independent of the licensing scheme established by articles V and VII of the Act (Ill. Rev. Stat. 1985, ch. 43, pars. 115 through 118.1, pars. 145 through 157). Moreover, the licensing fees imposed under section 5—3 of the Act (Ill. Rev. Stat. 1985, ch. 43, par. 118) are payable to the Liquor Control Commission, the agency responsible for administering and en-

forcing the Act, for deposit in the Dram Shop Fund (see Ill. Rev. Stat. 1985, ch. 127, par. 142y). Appropriations for the Commission's annual expenses are drawn from the Dram Shop Fund, with any surplus going to the general revenue fund (see Ill. Rev. Stat. 1985, ch. 127, par. 144.20). In contrast, the taxes imposed under article VIII are payable to the Department of Revenue (see Ill. Rev. Stat. 1985, ch. 127, par. 39b6); they are not earmarked for a special fund and therefore go directly to the general revenue fund (see Ill. Rev. Stat. 1985, ch. 127, par. 140). These differences illustrate the distinct purposes of the provisions and support the conclusion that articles V and VII are licensing measures, while article VIII is a revenue-producing measure. (See *Crocker v. Finley* (1984), 99 Ill. 2d 444, 452.) Article VIII therefore is subject to the uniformity provision of the State Constitution.

Accordingly, under our recent decision in *Searle Pharmaceuticals, Inc. v. Department of Revenue* (1987), 117 Ill. 2d 454, the appropriate inquiry in this case is whether the Department's action here in deciding to tax New Products at the rate applicable to distilled spirits rather than the rate that the Department has decided to apply to wine coolers is supported by a real and substantial difference between the two. As the parties' stipulation demonstrates, the items are nearly identical, and I would conclude that there is no real and substantial difference between the two that that would justify a tax on one that is more than eight times the tax imposed on the other. So long as the Department taxes wine coolers as ordinary wine, the same result should apply as well to New Products. This is not to say that the legislature could not place both items in a category different from ordinary wine; I note, however, that this case does not present the question whether the uniformity provision of article IX, section 2, of the State Constitution would per-

mit only those taxation schemes that are based exclusively on the percentage of alcohol by volume contained in a particular item. Action by the legislature may provide more definite guidance to the Department in its resolution of similar questions in the future.