**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALAMEDA BOOKS, INC., AND
HIGHLAND BOOKS, INC., a
California corporation,
             *Plaintiffs-Appellees,*

             v.

CITY OF LOS ANGELES, a municipal
corporation,
             *Defendant-Appellant.*

No. 09-55367
D.C. No.
2:95-CV-7771-DDP
(CTx)

OPINION

On Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted
October 6, 2010—Pasadena, California

Filed January 28, 2011

Before: Richard D. Cudahy,* Kim McLane Wardlaw and
William A. Fletcher, Circuit Judges.

Opinion by Judge Cudahy

*The Honorable Richard D. Cudahy, Senior United States Circuit Judge
for the Seventh Circuit, sitting by designation.

## COUNSEL

Clyde DeWitt and Cathy E. Crosson, Law Offices of Clyde DeWitt, for the plaintiffs-appellees.

Carmen A. Trutanich, City Attorney, Tayo A. Popoola, Deputy City Attorney, and Steven N. Blau, Deputy City Attorney, for the defendant-appellant.

## OPINION

CUDAHY, Circuit Judge:

The issue in this case is the district court's grant of summary judgment against the City of Los Angeles on the grounds that the City's Ordinance for the dispersal of adult entertainment businesses violates the First Amendment. We reverse. The district court erred by granting summary judg-

ment on the issue whether the plaintiffs had presented "actual and convincing" evidence "casting doubt" on the City's rationale for its Ordinance.

## I. Facts and Procedural History

The facts of this resilient case are not in dispute. Toward the end of the 1960's the City of Los Angeles (City), defendant-appellant, became concerned with a perceived proliferation of adult-themed[1] businesses. Acting on that concern, the City directed the Los Angeles Police Department to study the effects of concentrations of adult businesses on crime in the surrounding areas.

The Police Department (L.A.P.D.) report compared arrests between 1969 and 1975 in Hollywood, an area where adult entertainment businesses are concentrated, with those in the rest of Los Angeles in the same period. The L.A.P.D. determined that crime rates grew at higher rates in Hollywood. For instance, "every Part I crime [including homicide, rape, aggravated assault and robbery] committed against a person, not against property, increased at a higher rate in [the] Hollywood Area than in the City-wide total." In addition, "[p]rostitution arrests increased at a rate 15 times greater than the City average," and "pandering arrests in [the] Hollywood Area increased by 475.0 percent." From the L.A.P.D. data, the City concluded that concentrations of adult businesses are associated with increased rates of prostitution, robbery, assault and theft in the surrounding area.

In 1978, the City enacted an Ordinance, Ordinance No. 151,294, adding a new section to the Los Angeles Municipal Code, L.A.M.C. § 12.70 (1977). Section 12.70 defined numerous categories of "adult entertainment businesses," and

---

[1]Consistent with prior opinions in this litigation, we adopt the linguistic convention of the City Ordinance when discussing the subject matter the Ordinance regulates.

required that they be geographically dispersed. Specifically, no two adult entertainment businesses could be located within 1,000 feet of one another. L.A.M.C. § 12.70(C).

Of importance for this case, the Ordinance defined "Adult Arcade" as an "establishment where, for any form of consideration, one or more motion picture projectors . . . or similar machines, for viewing by five or fewer persons each, are used to show [adult-themed films]." L.A.M.C. § 12.70(B)(1). An "Adult Bookstore" was defined as an "establishment which has as a substantial portion of its stock-in-trade and offers for sale . . . any one or more of the following: (a) [adult-themed print media] or (b) [adult] [i]nstruments, devices or paraphernalia." *Id.* § 12.70(B)(2). Pursuant to the 1978 Ordinance, then, it was unlawful to operate an adult arcade within 1,000 feet of an adult bookstore.

A problem arose for the City when it realized that the Ordinance did not explicitly prohibit the operation of an adult arcade and an adult bookstore within the same establishment. Therefore, in 1983 the City enacted Ordinance No. 157,538, amending the language of the existing ordinance to remedy this oversight. Specifically, L.A.M.C. § 12.70(C) was amended to provide that no two adult entertainment businesses could operate at the same location. In addition, the 1983 amendments added L.A.M.C. § 12.70(B)(17), which clarifies that each adult entertainment business as defined in the Ordinance "constitute[s] a separate adult entertainment business[ ] even if operated in conjunction with another adult entertainment business at the same establishment." Thus, beginning in 1983, the L.A.M.C. unambiguously prohibited the operation of an adult arcade within an adult bookstore.

Plaintiffs Alameda Books and Highland Books opened for business in 1991 and 1993, respectively.[2] Both businesses sell

---

[2]The two plaintiffs were merged in 2002 into a single corporation, Beverly Books, Inc., which operates the two stores. To be consistent with the designations used throughout this prolonged litigation, we shall continue to refer to the plaintiffs as Alameda Books and Highland Books. *See* Fed. R. Civ. P. 25(c).

adult print media and videotapes, and both feature adult arcades where customers can view videotapes for a fee. Therefore, both Alameda Books and Highland Books were and are adult bookstores containing an adult arcade, as defined by the L.A.M.C. From the day they began operating as combined adult retail and arcade establishments, then, both businesses operated in violation of L.A.M.C. § 12.70. This fact is uncontested.

Although their businesses were unlawful, the plaintiffs operated without government interference for several years.[3] On March 15 of 1995, a city inspector informed both parties that they were violating the Ordinance. On November 16, 1995, the plaintiffs filed suit in the U.S. District Court for the Central District of California, pursuant to 42 U.S.C. § 1983. They sought injunctive relief and a declaratory judgment that enforcing the Ordinance against the plaintiffs would violate their First Amendment rights.

Subsequently, the district court granted summary judgment in favor of the plaintiffs. The court reasoned that, when the City amended the Ordinance in 1983, it had no basis for believing that the operation of combined (as opposed to neighboring) adult businesses led to harmful secondary effects. *Alameda Books v. Los Angeles*, No. CV 95-7771-DDP (CTx), slip op. at 13 (C.D. Cal. May 28, 1998). The court further asserted that "[t]he classification of certain adult entertainment activities as separate businesses . . . is subject to a [heightened] standard of review because the City applies these

---

[3]The U.S. District Court for the Central District of California enjoined the enforcement of the amended Ordinance in connection with litigation involving another adult entertainment business. *See Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1526 (9th Cir. 1993), *cert. denied*, 511 U.S. 1030 (1994). A settlement following the *Topanga Press* litigation included a permanent injunction against the enforcement of the Ordinance against the *Topanga Press* plaintiffs. The City settled with additional adult entertainment business defendants in 1995, before the present case began.

definitions only to businesses that engage in protected speech." *Id.* at 20. The district court determined that the Ordinance failed to survive strict scrutiny, because the City had not demonstrated that the ordinance was necessary to support a compelling government interest. *Id.* at 29. Therefore, it was unconstitutional under the First and Fourteenth Amendments. *Id.* at 33.

The City appealed from the grant of summary judgment, and we affirmed the district court on alternative grounds. *Alameda Books, Inc. v. City of Los Angeles*, 222 F.3d 719 (9th Cir. 2000). In particular, we held that the question whether L.A.M.C. § 12.70(C) is content-based or content-neutral need not be reached, because the Ordinance fails to meet even the more permissive intermediate scrutiny that would apply to a content-neutral regulation. *Id.* at 723. Although the City had a "substantial . . . interest" in reducing crime, the City had failed to show that the Ordinance was "designed to serve" this interest. *Id.* at 723-24. This was true because the 1977 Study focused only on the effect of establishments concentrated within a particular area, and had nothing to say about the effects of businesses within the same establishment. *Id.* at 724-25.

The Supreme Court reversed this decision and remanded the case in a plurality decision. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002). In doing so, the Court established a new framework for reviewing ordinances aimed at reducing the secondary effects of adult entertainment businesses.

Justice O'Connor's plurality opinion reaffirmed the three-part framework established in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), for determining the legality under the First Amendment of restrictions on adult entertainment businesses. *Alameda Books*, 535 U.S. at 433. The Court then prescribed a three-part burden-shifting test for determin-

ing whether a regulation meets the third step[4] of the *Renton* test, which requires the restriction to serve a substantial government interest. The burden-shifting framework provides that after a municipality satisfies its burden of supplying evidence supporting its rationale for passing an ordinance, the plaintiffs may attempt to "cast doubt" on the municipality's evidence and rationale, after which the municipality may attempt to rehabilitate its rationale. *Alameda Books*, 535 U.S. at 438-39.

The four-member plurality of the Court further explained that contrary to our decision, it was reasonable for the City to infer from the 1977 study that a concentration of adult operations in a single establishment will lead to increased undesirable effects. *Id.* at 436-37. The plurality concluded it was error to require the City to present evidence not only showing that the Ordinance will reduce undesirable effects, but also demonstrating that such evidence does not support some other method of reducing undesirable effects. *Id.* at 438. Therefore, the 1977 study provided an adequate rationale for the Ordinance, which satisfied the first step of the new *Alameda Books* burden-shifting framework. *Id.* at 439, 442.

Justice Kennedy wrote separately in concurrence with Justice O'Connor's plurality opinion. Because he expressed a conditional agreement with the plurality, his narrower reasoning is the only reasoning that commands the majority of the Court, and has been treated as binding. *See Ctr. for Fair Pub. Policy v. Maricopa Cnty.*, 336 F.3d 1153, 1161 (9th Cir. 2003) ("Justice Kennedy's concurrence may be regarded as the controlling opinion.") (citing *Marks v. United States*, 430 U.S. 188 (1976)).

---

[4]The first step is to inquire whether the regulation bans the protected speech altogether, or whether it can be viewed as a time, place and manner restriction. *See Dream Palace v. Cnty. of Maricopa*, 384 F.3d 990, 1013 (9th Cir. 2004). If the latter obtains, then the second step is to inquire whether the regulation is designed to remedy secondary effects of speech, and therefore subject to intermediate scrutiny. *Id.*

Most important for our purposes, Justice Kennedy's concurrence provided that "a city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact." 535 U.S. at 449. Put another way, "[a] city may not assert that it will reduce secondary effects by reducing speech in the same proportion." *Id*. Justice Kennedy reasoned that "[i]t is no trick to reduce secondary effects by reducing speech or its audience." *Id.* at 450. Applying that principle to the present facts, the concurrence explained that, "the premise [underlying the Ordinance] must be that businesses — even those that have always been under one roof — will for the most part disperse rather than shut down." *Id.* at 451. Taken as a whole, then, the Supreme Court's *Alameda Books* opinion requires courts to employ the new burden-shifting framework when applying the traditional *Renton* analysis, and provides that a municipality's justification must not be that its regulation will reduce secondary effects simply by reducing speech proportionately. However, the application of such a principle is not as simple as might appear.

The Supreme Court remanded the case, and we, in turn, remanded it to the district court. 295 F.3d 1024 (9th Cir. 2002). Shortly thereafter, the parties agreed to postpone briefing and discovery until certain other Ninth Circuit cases interpreting the Supreme Court *Alameda Books* decision were decided. *See Alameda Books*, No. CV 95-7771 DDP (CTx), 2008 U.S. Dist. LEXIS 108860, at *9 (C.D. Cal. July 16, 2008). This agreement is responsible for the lengthy interval between the 2002 Supreme Court remand and the district court's 2008 re-adjudication.

In 2007, the district court entertained the parties' cross-motions for summary judgment. The court's decision thoroughly and meticulously discusses the history of the case and other relevant case law before reaching the merits. In considering the parties' summary judgment motions, the district

court made several threshold decisions of importance to this appeal. First, the court struck the second of two[5] declarations by the City's expert witness Vanita Spaulding, a business valuation professional, who offered a declaration to the effect that it would be possible to split a previously joined adult arcade business and adult bookstore business while preserving the economic viability of the arcade. She arrived at this conclusion by analyzing the plaintiffs' financial statements. She analyzed the profitability of their retail businesses and their arcade businesses by analyzing the existing data for each of the two kinds of businesses, as currently operated. She made no attempt to determine the extent, if any, to which the physical association of the two kinds of business contributed to the profitability of either one.

The plaintiffs argued that Spaulding's declaration should be stricken because it would confuse the issues and cause undue delay under Fed. R. Evid. 403, would not assist the trier of fact under Fed. R. Evid. 702 and because it lacked foundation under Fed. R. Evid. 703.

The district court found that Spaulding's testimony was confined only to the profitability of adult arcades which were part of adult retail establishments. But the fact that an adult arcade is profitable when physically joined to another adult business, did not, in the district court's view, fairly lead to the conclusion that an adult arcade could operate profitably as a free-standing unit. The court noted that "the question in this case is not whether the arcade portion of the combination business is profitable . . . [but] whether the arcade as a stand-alone business will continue to exist once unmoored from the bookstore component." *Alameda Books*, 2008 U.S. Dist. LEXIS 108860, at *37-38. The court further stated that Spaulding had no basis for concluding that patrons would

[5]Vanita Spaulding's first declaration, which the district court did not strike, addresses the existence of alternative avenues for viewing adult entertainment.

visit a free-standing arcade business because she did not purport to have any specific knowledge of the industry and had not interviewed business owners or customers. *Id.* at *38-39.

Nevertheless, the district court did not find Spaulding's statistics to be incredible. Rather, the court described her review of the costs and expenses of the retail and arcade components of the combined stores, as "an analysis with which no one disagrees." *Id.* at *51. Therefore, despite striking Spaulding's declaration, the court accepted that the arcade components of the plaintiffs' businesses as presently operated are quite profitable, accounting for approximately one-half of the revenues of the combined businesses and the majority of the stores' net income. Thus, even if this evidence is not admissible for the immediate purpose intended, it may be useful in a more extended analysis.

The district court's second important threshold decision was to reject the City's objections to declarations by the plaintiffs' two witnesses, William Andrus and Rick Hinckley. William Andrus is the vice-president of Beverly Books, the corporation which now owns Alameda Books and Highland Books. He testified that he has been involved in the adult entertainment retail business for twenty years. He further opined that a stand-alone adult arcade would not be profitable because many current users of the arcade are retail patrons considering a purchasing decision, conveniently accommodated by a retail store in the same premises. In addition, a stand-alone adult arcade would be viewed to be "seedy" like adult movie theaters, most of which went out of business when prerecorded adult videos became available. He testified in conclusion that, "I have never seen or heard of a business that existed only as an adult arcade."

Rick Hinckley is the president of Video Simplex, a San Diego company that builds and installs adult arcade systems. The company installed the adult arcade systems in both Alameda Books and Highland Books, and Hinckley was person-

ally involved in those installations. He also testified, like Andrus, that the consensus of those in the adult entertainment industry was that a stand-alone adult arcade would not attract a significant number of customers because many current users are retail patrons considering whether to purchase merchandise available in a retail store located in the same premises as an arcade. He repeated the observation that a stand-alone adult arcade, like an adult motion picture theater, would be viewed as "seedy."

Both the Andrus and Hinckley declarations are brief and unelaborated. Neither Andrus nor Hinckley purported to offer any empirical support for the shared position that a stand-alone adult arcade would not be viable. The content of the declarations is strikingly similar, and certain important passages are identical. For example, Andrus and Hinckley each declared, verbatim, as follows:

> [A] stand-alone adult arcade has the same image problem as do auditorium adult motion picture theatres, which have become all but extinct because of that problem [or "reason"], namely, that they are perceived by the public as "seedy" and as attracting an undesirable element of customers, an image that no longer attaches to adult retail businesses, which tend to be more aesthetically attractive.[Footnote] That explains why free-standing adult theaters (i.e., auditorium-style theaters) nearly vanished beginning as prerecorded home adult videotapes became more widely available. Although such businesses were reasonably profitable during the 1970s, as prerecorded adult videotapes became more widely available during the 1980s, nearly all of them went out of business, the few remaining being those that were annexed to adult book and video stores, as presently are all adult arcades.

The text of the footnote referenced midway through this passage and dealing with the increasingly "couples-oriented"

nature of adult entertainment retail is also identical in both declarations.

The City objected to the Andrus and Hinckley declarations, not alleging explicitly that the declarants were potentially biased, but instead that their testimony was speculative and lacking in foundation. But the district court rejected the City's arguments, observing that Andrus and Hinckley, "with their decades of experience owning and operating the specific businesses at issue in this case and their knowledge of the industry, have sufficient foundation to testify that they are not aware of any stand-alone arcade ever existing." *Alameda Books*, 2008 U.S. Dist. LEXIS 108860, at *47-48. Because the declarants were testifying as to their understanding of the industry, and not to a scientific process of causation, their industry experience was "all the foundation necessary." *Id.* at 49. The district court acknowledged that both witnesses were closely associated with a party to the litigation, but did not address the obvious bias of these witnesses relating to their close association and apparent financial interest.

Applying the second step[6] of the Supreme Court's *Alameda Books* burden-shifting framework, the district court held that "[p]laintiffs' evidence casts the requisite doubt" because the Andrus and Hinckley declarations "suggest[ ] that the City's intent in passing the ordinances was to reduce secondary effects by closing arcades — impermissibly 'reducing speech in the same proportion.' " *Id.* at 49 (citing *Alameda Books*, 535 U.S. at 449 (Kennedy, J., concurring)). Since Vanita Spaulding's declaration had been struck, there remained little with which the City could rebut the plaintiffs' evidence that the Ordinance ran afoul of Justice Kennedy's concurrence. Thus, the district court ruled,

---

[6]As noted above, the Supreme Court had held that the 1977 Study was sufficient foundation for the City's Ordinance under the first step of the *Alameda Books* framework. 535 U.S. at 436-37.

> Defendant now bears the burden to present some evidence that arcades could survive on their own. The City has not made this showing. Instead, the City relies on the [sic] Vanita Spaulding's Second Declaration, which reviews the revenue and expenses generated and incurred by the arcade and retail components . . . . However, as already discussed, her declaration is not admissible.

*Id.* at *51-52. The court went on to conclude that "[t]here is . . . no question of material fact but that Los Angeles Municipal Code section 12.70(C) cannot withstand intermediate scrutiny, and that it violates the First Amendment." *Id.* at *60-61. Accordingly, the district court granted summary judgment for the plaintiffs. The City filed a timely appeal.

## II. Applicable Law

### A. First Amendment Framework Post-*Alameda Books*

**[1]** Following *Alameda Books*, the test for the constitutionality under the First Amendment of a dispersal ordinance relating to adult businesses remains that prescribed in *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986).[7] We have encapsulated that test recently as follows:

> First, we must determine whether the regulation is a complete ban on protected expression. *Renton*, 475 U.S. at 46. Second, we must determine whether the county's purpose in enacting the provision is the amelioration of secondary effects. *Id.* at 47. If so, it is subject to intermediate scrutiny, and we must ask whether the provision is designed to serve a substan-

---

[7]*See Ctr. for Fair Pub. Policy*, 336 F.3d at 1164 ("Because five members of the Supreme Court agreed that 'the central holding of *Renton* is sound' we apply the traditional three-part test in order to determine the constitutionality of [an ordinance].").

tial government interest, and whether reasonable alternative avenues of communication remain available. *Id.*

*Dream Palace*, 384 F.3d at 1013.

**[2]** The Supreme Court's *Alameda Books* plurality clarified the "substantial government interest" standard of the third step of *Renton*, by prescribing the burden-shifting test we have noted:

> If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton*. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Alameda Books*, 535 U.S. at 438-39.

**[3]** Justice Kennedy's concurrence slightly modifies this burden-shifting framework by narrowing the universe of allowable municipal rationales to support an ordinance. In particular, "[a] city may not assert that it will reduce secondary effects by reducing speech in the same proportion." *Alameda Books*, 535 U.S. at 449 (Kennedy, J., concurring). Justice Kennedy went on to elucidate what this means for the present dispersal statute: "The claim . . . must be that [the] ordinance will cause two businesses to split rather than one to close, that the quantity of speech will be substantially undiminished, and that total secondary effects will be significantly reduced." *Id.* at 451.

In addition, the City raises a statute of limitations argument. The statute of limitations applicable to an action pursuant to 42 U.S.C. § 1983 is the personal injury statute of limitations of the state in which the cause of action arose. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007); *DeGrassi v. City of Glendora*, 207 F.3d 636, 644 (9th Cir. 2000). The California limitations period applicable in this case is one year. *See Maldonado v. Harris*, 370 F.3d 945, 954-55 (9th Cir. 2004).[8]

## III.   Discussion

### A.   Vanita Spaulding's Second Declaration

As a threshold issue, we do not upset the district court's decision to strike Vanita Spaulding's declaration pursuant to Federal Rule of Evidence 403, Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time, and Federal Rule of Evidence 702, Testimony by Experts, because the court did not abuse its discretion in doing so.

The district court properly perceived that allowing Spaulding's testimony as to the viability of stand-alone adult entertainment arcades would confuse the issues under Fed. R. Evid. 403 because it is based on evidence of the profitability of adult arcades only when combined with an adult bookstore. *Alameda Books*, 2008 U.S. Dist. LEXIS 108860, at *40-41. Similarly, the court properly excluded her declaration under Fed. R. Evid. 702 in view of her unsupported assumption of a relationship between the current profitability of adult arcades and their viability as free-standing units. *See, e.g., McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 806-07 (9th Cir.

---

[8]Although the California personal injury statute of limitations was extended to two years in 2003, *see* 2002 Cal. Legis. Serv. Ch. 448 (S.B. 688) (West), Cal. Civ. Proc. Code § 335.1, an extension of the California statute of limitations does not apply to claims under 42 U.S.C. § 1983 already barred. *Maldonado*, 370 F.3d at 955. If the plaintiffs filed their complaint untimely in 1995, the extension of the limitations period in 2003 would not redeem it.

1988). Finally, the district court properly observed that Spaulding had no experience or familiarity with the adult entertainment industry. Therefore, excluding Spaulding's second declaration was a permissible exercise of the district court's discretion over the admissibility of evidence.[9]

## B.   Step Two of the *Alameda Books* Framework: Casting Doubt

The district court erred, however, by granting summary judgment at the second step of the *Alameda Books* analysis based on the Andrus and Hinckley declarations, because that court treated these declarations as "actual and convincing" enough to justify summary judgment despite their obvious and important shortcomings, and because the court did not consider the declarants' facial bias. To provide context for this holding, it is instructive to review how we have dealt with similar adult-entertainment cases reaching this stage of the *Alameda Books* framework.

[4] Although we have interpreted the Supreme Court's *Alameda Books* decision on several occasions, we have yet to hold that a plaintiff has succeeded in "casting doubt" on the city's evidence or rationale. It emerges from these cases that to succeed in "casting doubt" on a city's evidence or rationale, a plaintiff must do more than point to a municipality's lack of empirical evidence, *Ctr. For Fair Pub. Policy*, 336 F.3d at 1168, or challenge the methodology of the municipality's evidence, *Gammoh v. City of La Habra*, 395 F.3d 1114, 1126-27 (9th Cir. 2005). When a municipality offers multiple rationales in support of an ordinance, the plaintiff must address each one. *See Fantasyland Video, Inc. v. Cnty. of San Diego*, 505 F.3d 996, 1002 (9th Cir. 2007); *World Wide Video v. City of Spokane*, 368 F.3d 1186, 1196 (9th Cir. 2004). The

---

[9]Having so held, we do not address the court's alternative reasoning for excluding Vanita Spaulding's second declaration pursuant to Fed. R. Evid. 703.

Sixth Circuit has explained that the plaintiffs bear a heavier evidentiary burden in attempting to "cast doubt" than the municipality does in justifying the ordinance at the outset, and that the plaintiffs' burden will not be carried by "anecdotal" or "unsystematic" evidence. *Richland Bookmart v. Knox Cnty.*, 555 F.3d 512, 527-28 (6th Cir. 2009).

[5] An important common element in these cases with respect to the second step of *Alameda Books* is that to successfully "cast doubt" on a municipality's rationale, a plaintiff must offer not merely evidence, but "actual and convincing" evidence. *See Fantasyland Video, Inc.*, 505 F.3d at 1001 (citing *Alameda Books*, 535 U.S. at 439). Such evidence "must do more than challenge the government's rationale; it must convincingly discredit the foundation upon which the government's justification rests." *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 747 (4th Cir. 2010) (citing *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 516 (4th Cir. 2002)).

[6] We are not satisfied that the plaintiffs' evidence in this case was "actual and convincing" enough to justify summary judgment—and we emphasize that the procedural posture here was summary judgment. The district court did not explicitly reach a contrary conclusion. Rather, the court dismissed the lack of specific factual foundation in the declarations, did not mention that they contain lengthy passages of identical text and did not discuss at all the facial bias of the declarants. Rather, the district court seemed to opine that no evidence must yield to some evidence—no matter how superficially frail and unexamined—to support a summary judgment.

[7] The district court's failure to take into account as part of its explicit analysis the bias of the plaintiffs' witnesses was a significant oversight.[10] The credibility of witnesses is almost

---

[10]In so observing, we are not deterred by the City's failure to argue articulately that the declarants are less "convincing" in view of their relationship to the plaintiffs. The potential bias problem, it seems to us, was

categorically a trial issue, *see SEC v. M & A West, Inc.*, 538 F.3d 1043, 1054-55 (9th Cir. 2008), which means that, if bias is an evident factor, summary judgment is not generally indicated. The existence of credibility issues on material questions means that plaintiffs cannot short-circuit the "actual and convincing" language of *Alameda Books* and its progeny by seeking to have their case resolved at summary judgment. *See Anderson*, 477 U.S. at 254 ("[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."). If this "actual and convincing" language is to be meaningful, the district court must consider whether the plaintiffs have complied with it before resolving the case in their favor. This means considering *inter alia* the patent biases of the plaintiffs' witnesses, since evidently biased testimony is not generally convincing. *See United States v. Abel*, 469 U.S. 45, 52 (1984). Here, the extent to which the Andrus and Hinckley declarations are "convincing" is diminished by their obvious self-interest: one declarant is the vice-president of a party to this litigation, and the other is the president of a Southern California company that installs adult arcades, including those owned by the plaintiff. The content of the declarations strikes us as plausible, but the sources are necessarily suspect.

Moreover, as the City has argued, the Andrus and Hinckley declarations actually establish very little. Neither declarant offers any empirical data in support of his conclusion. Their testimony amounts to a conclusory assertion that they work in the industry, and we should take them at their word that adult arcades could not survive as stand-alone businesses because they would be perceived as too "seedy." We do not see any support, other than the *ipse dixit* of the declarants, for the

---

obvious — even if not advanced articulately by the City. The district court was aware of, and in fact recited in its memorandum, the close relationship between the plaintiffs and their witnesses. The court was thus required to consider this prominent problem in weighing the plaintiffs' evidence.

asserted relationship between the seediness of an adult entertainment venue and its ability to stay in business. This lack of substantiation is more problematic when viewed in the context of the arcades' profitability, as demonstrated in Vanita Spaulding's financial analysis. The Spaulding analysis showed the arcades to be profitable in their present forms, a relevant step in a more in-depth examination of their performance in isolation.

**[8]** Viewing the evidence in the light most favorable to the City, the plaintiffs' two declarations are weakened by their not insignificant verbatim repetition and are affected by obvious bias. The district court should have at least recognized the bias problem in determining whether they successfully "cast doubt" on the City's rationale for its Ordinance. At trial, the frailties of this evidence and its conformity to the "actual and convincing" standard of the *Alameda Books* framework present an issue of material fact that might be examined, but summary judgment is not indicated.[11]

## C.   Statute of Limitations

Finally, we must turn briefly to the City's argument that the plaintiffs filed suit untimely under the one-year California statute of limitations. This argument is readily disposed of by the City's waiver. A statute of limitations is subject to waiver, including by a government defendant in a § 1983 case. *See, e.g.*, *Lucchesi v. Bar-O Boys Ranch*, 353 F.3d 691, 696-97 (9th Cir. 2003) (assuming that a waiver by a government defendant in a § 1983 case is possible, although not finding waiver under the circumstances). Here, the City did not argue the statute of limitations in its May 31, 2007 motion for sum-

---

[11]Although the parties submitted cross-motions for summary judgment, this does not preclude us from finding that the case cannot be adjudicated without a trial. *See United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir. 1978). We feel all the less obliged to provide for summary adjudication given the important public issues involved in the case.

mary judgment, and the district court's opinion does not address it.[12] There may also have been waiver at an earlier point, but this May 2007 waiver was the latest and clearest.

We REVERSE the district court's grant of summary judgment in favor of the plaintiffs, and REMAND this case for further proceedings.

---

[12]The City raised the statute of limitations before the district court, and suffered an adverse ruling in a January 11, 1998 order denying both parties' motions for summary judgment. The court ruled that "[b]ecause of the continuing nature of First Amendment injuries, the Court rejects the City's statute of limitations defense." The City apparently did not appeal from this determination, and we did not address it in our first encounter with the case. It was not among the questions for which the Supreme Court granted certiorari, and the Supreme Court accordingly did not consider it.